(Not for Publication)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

_____
                                        :
MARS, INCORPORATED,                     :
                                        :
                Plaintiff,              :
                                        :
        v.                              :
                                        :   Civil No. 05-3165 (RBK)
JCM AMERICAN CORP. and                  :
JAPAN CASH MACHINE CO., LTD.,           :
                                        :
                Defendants.             :   **OPINION**
_____ :
                                        :
JCM AMERICAN CORP. and                  :
JAPAN CASH MACHINE CO., LTD.,           :
                                        :
                Counterclaim Plaintiffs,:
                                        :
        v.                              :
                                        :
MARS, INCORPORATED,                     :
                                        :
                Counterclaim Defendants.:
_____ :

**KUGLER**, United States District Judge:

Presently before the Court are motions by Defendants and Counterclaim Plaintiffs JCM

American Corporation and Japan Cash Machine Co., Ltd. ("JCM") for partial summary judgment

on claim construction of U.S. Patent Number 5,577,589 ("the '589 Patent") against Plaintiffs and

Counterclaim Defendants Mars, Inc. and MEI, Inc. ("Mars"), and for partial summary judgment

on invalidity of claims 19, 20, and 21 and for unenforceability of the '589 Patent against Mars. Mars alleges, inter alia, infringement of the '589 Patent by JCM.  The Court will construe claims 19, 20, and 21 as set forth below, and based on those constructions, the Court will deny JCM's motion for partial summary judgment on invalidity of those claims and for unenforceability of the '589 Patent.

## I.       BACKGROUND

### A.       Factual History

The present action involves two United States Patents: the '589 Patent and U.S. Patent No. 6,712,352 ("the '352 Patent").  Relevant to the motions currently before this Court is the history involving the '589 Patent.  Jaime G. Garcia Tinoco is the named inventor of the '589 Patent.  The '589 Patent claims priority to two patent applications filed in Europe and a Patent Cooperation Treaty Application ("PCT Application") for which Mr. Tinoco is also credited as the inventor.  Both of these applications and the PCT Application contain many of the same drawings and descriptions as the '589 Patent.

The application for the '589 Patent was filed on September 30, 1994 and issued as the patent-in-suit on November 26, 1996.  The '589 Patent is used in machines, known as "document handlers," that accept, identify, and store documents such as banknotes.  Document handlers typically include an inlet aperture into which a person inserts a document, a transport channel through which the document travels and is verified, and a box where verified documents are stacked and stored.  Document handlers also commonly contain "inlet shutters," which prevent the premature introduction of a second document by blocking the document handler's transport channel.

2

The '589 Patent describes a particular type of inlet shutter, which is symmetrical in shape and rotates on an axis.  This shutter is also transversed by an open slot through which an inserted document can pass.  Once the document goes through the slot, the shutter rotates to move the slot out of alignment with the inlet aperture and document transfer channel, thereby preventing the premature introduction of a second bill.

While other shutters predating the invention in the '589 Patent include these same features, the '589 Patent purports to reflect at least two innovations.  The rotating shutters preceding the '589 Patent had two common problems: they were sensitive to vibration and inserted documents got caught in the space between the shutter and its encasing instead of passing through the slot in the shutter.  The '589 Patent remedies these deficiencies by distributing the mass of the shutter and its actuating components so that sensitivity to vibration is reduced and by using mutually interengaging features at the interface between the shutter slot and the document transfer passage, which prevents bills from straying between the shutter and its encasing.

### B.    Procedural History

Mars filed its Complaint on June 17, 2005, accusing JCM's Universal Bill Acceptor of infringing the '589 Patent and the '352 Patent.  JCM filed its Answer on September 23, 2005 and asserted counterclaims against Mars.  Mars moved to dismiss JCM's counterclaims on October 13, 2005, and this Court later denied that motion in a June 14, 2006 Order.  This Court also denied an initial motion for partial summary judgment filed by JCM, which alleged invalidity of the '589 Patent based on 35 U.S.C. § 112.

On June 22, 2007, JCM filed the two more motions for partial summary judgment now

before the Court.  In its claim construction motion, JCM asks the Court to adopt its proposed

definitions for claims 19, 20, and 21.  JCM argues that Mars should be bound to its interrogatory

responses regarding claim construction in which Mars stated, without elaboration, that the claims

should be given their plain and ordinary meaning.  In addition, argues that a patent application

dated January 10, 1991 for an invention by Franz Rossler anticipates and thereby invalidates

claims 19-21.  JCM argues further that inequitable conduct occurred during the prosecution of

the '589 Patent, which should render it unenforceable.  Mars opposes JCM's motions for partial

summary judgment and also submits its own proposed claim constructions.  The Court held a

Markman hearing on March 7, 2008.

Concurrent with its suit against JCM in this Court, Mars also sued JCM in Dusseldorf,

Germany on a German patent containing claims nearly identical to those of claims 19-21 in the

'589 Patent.  In response, JCM filed a nullity action with the German Patent Office alleging that

a German patent application for the same invention by Franz Rossler ("German Rossler

Reference") published January 17, 1991 renders the equivalent to claims 19-21 in German patent

invalid.

## II.    STANDARD

### A.    Claim Construction

To prove patent infringement, a plaintiff must demonstrate that the accused device or

method contains all the limitations of the claimed invention.  Johnson Worldwide Assocs., Inc. v.

Zebco Corp., 175 F.3d 985, 988 (Fed. Cir. 1995).  As a prerequisite to the ultimate disposition,

however, a court must determine as a matter of law the meaning and the scope of the disputed

patent's claims.  Id.  Claim construction is a question of law; therefore, it is "[t]he duty of the

trial judge . . . to determine the meaning of the claims at issue." Exxon Chem. Patents, Inc. v. Lubrizoil Corp., 64 F.3d 1553, 1555 (Fed. Cir. 1995).

The scope of a patented invention is defined by the enumerated claims that comprise the patent. Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005). Absent an express intent to impart a novel meaning, the words of a claim are given their "ordinary and customary meaning," which is defined as "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." Id. at 1312-13 (citations omitted). The court must adopt the perspective of one who "read[s] the words used in the patent documents with an understanding of their meaning in the field, and [who has] knowledge of any special meaning and usage in the field."

Intrinsic evidence, which includes the patent itself, including the claims, the specification, and the prosecution history, is the key initial component of claim construction. Id. at 1314. Claim construction begins with the language of the claims themselves, since the claim language is chosen by the inventor to distinctly claim the subject matter of the invention. ACTV, Inc. v. Walt Disney Co., 346 F.3d 1082, 1088 (Fed. Cir. 2003). Furthermore, the specification can "act[] as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication." Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996). It is also "entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description for guidance as the meaning of the claims." Phillips, 415 F.3d at 1317.

Secondarily, a court may draw on extrinsic evidence regarding "relevant scientific principles, the meaning of technical terms, and the state of the art." Id. Extrinsic evidence derives from sources outside the patent and prosecution history, such as expert testimony,

dictionaries, or treatises, and although it may be useful, "it is unlikely to result in a reliable

interpretation of patent claim scope unless considered in the context of the intrinsic evidence."

Id. at 1319.  Moreover, the Federal Circuit has cautioned, "the use of the dictionary may extend

patent protection beyond what should properly be afforded by the inventor's patent."  Id. at 1322.

**B.**      **Summary Judgment**

Summary judgment is appropriate where the Court is satisfied that "there is no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter of

law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986).  A genuine issue

of material fact exists only if "the evidence is such that a reasonable jury could find for the

nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  When the Court

weighs the evidence presented by the parties, "[t]he evidence of the nonmovant is to be believed,

and all justifiable inferences are to be drawn in his favor."  Id. at 255.

The burden of establishing the nonexistence of a "genuine issue" is on the party moving

for summary judgment.  Celotex, 477 U.S. at 330.  The moving party may satisfy this burden by

either (1) submitting affirmative evidence that negates an essential element of the nonmoving

party's claim; or (2) demonstrating to the Court that the nonmoving party's evidence is

insufficient to establish an essential element of the nonmoving party's case.  Id. at 331.

Once the moving party satisfies this initial burden, the nonmoving party "must set forth

specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  To do so, the

nonmoving party must "do more than simply show that there is some metaphysical doubt as to

material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to

establish the existence of [every] element essential to that party's case, and on which that party

will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.

## III.   DISCOVERY

As an initial matter, the Court must briefly address JCM's argument that Mars should be

precluded from submitting proposed claims construction because in its interrogatory responses,

Mars advocated only that claims 19-21 should be given their "plain and ordinary meaning."

Based on Mars' previous stance, JCM states that Mars should not now be permitted to controvert

JCM's proposed construction.  In response, Mars argues that JCM never notified Mars that its

interrogatory responses were deficient.  Mars states that it intended to submit its detailed

proposed construction pursuant to the Court's order to do so by July 31, 2007, but JCM filed its

partial summary judgment motions in the meantime.

The Court will not preclude Mars' submission concerning the meanings of the disputed

claims.  JCM did not inform the Court that it considered Mars' interrogatory responses

unacceptable, nor did it adhere to the Court's July 31 deadline.  JCM opted to file its motion for

partial summary judgment on claim construction instead of conferring with Mars on the

appropriate procedure for the process.  Therefore, the Court will consider both parties' arguments

in arriving at constructions for claims 19-21.

## IV.   CONSTRUCTION OF THE DISPUTED CLAIMS

### A.   Claim 19

Claim 19 provides:

A shutter arrangement comprising a shutter member including a passage through
which a document can pass, said passage being alignable with a document
transport passage of a document handling apparatus by pivoting the shutter
assembly about the pivot axis, said shutter being located within a surround,

wherein the surround and the shutter carry mutually interengaging features to prevent a flat document from passing between the shutter and the surround.

The Court will address each limitation of claim 19 individually.

### 1.    "A shutter arrangement"

"A shutter arrangement" appears exclusively in the preamble statement in each of the disputed claims.  JCM argues that the meaning of this preamble must be construed because it places the claimed invention in a specific context.  JCM proposes the following construction for "shutter arrangement": "a shutter—meaning a blocking device positioned between the aperture and the inlet channel of a document processor—and actuating components that move the blocking device."  In forming this definition JCM draws on several sources in the '589 Patent and its file history.  First, JCM cites the patent's recitation of prior art as disclosing other shutters between the aperture and the inlet channel that share the same purpose as the '589 Patent.  In addition, JCM refers to the "assembly" that makes up "the shutter and its actuating components (and other components which can move with the shutter)" in the specification.  Lastly, JCM points to an assertion in the file history that claim 1 of the '589 Patent is patentable over certain prior art because the '589 Patent involves "a moving assembly" of at least one other component that moves with the shutter.

Mars argues that as a preamble statement, "a shutter arrangement" does not limit the claims and thus does not need to be defined.  Alternatively, Mars maintains that JCM's proposed definition is inappropriately narrow because it does not account for certain components of claim 19 such as the "surround" and the "channel."  If deemed limiting, Mars proposes that the phrase "a shutter arrangement" should be defined as "components arranged with a shutter in a document handler."

8

"Whether to treat a preamble as a limitation is a determination 'resolved only on review of the entire[ ] . . . patent to gain an understanding of what the inventors actually invented and intended to encompass by the claim.'" Catalina Marketing Int'l, Inc. v. Coolsavings.com, Inc., 289 F.3d 801, 808 (Fed. Cir. 2002) (quoting Corning Glass Works v. Sumitomo Elec. U.S.A., Inc., 868 F.2d 1251, 1257 (Fed. Cir. 1989)).  A preamble does not limit the claims where the "patentee defines a structurally complete invention in the claim body," and the preamble merely states a purpose or intended use for the invention or serves as a convenient label.  Id. (quoting Rowe v. Dror, 112 F.3d 473, 478 (Fed. Cir. 1997)).  A preamble does limit an invention, however, if it is necessary to understand limitations or terms in the claim body.  Id. (citation omitted).  "[C]lear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art" renders the preamble an additional claim limitation.  In contrast, when the claim body describes a structurally complete invention such that deletion of the preamble phrase does not affect the structure or steps of the claimed invention, the preamble does not limit.  Id. (citing IMS Tech., Inc. v. Haas Automation, Inc., 206 F.3d 1422, 1434 (Fed. Cir. 2000)).

The preamble "a shutter arrangement" does not affect the scope of claims 19-21.  The rest of the language of claim 19 describes a structurally complete invention; thus, the preamble adds no information.  There is no evidence that the '589 Patent relies on the preamble to distinguish it from prior art references.  "A shutter arrangement" instead appears to be used, as JCM suggests, to lend context to the claimed invention.  As a result, the Court need not construe the meaning of the preamble.

**2.      "shutter" and "shutter member"**

Claim 19 refers to "a shutter member," "shutter assembly," "said shutter," and "the shutter" in that order.  "Shutter member" and "shutter assembly" appear nowhere else in the '589 Patent or its file history.  Based on the use of these terms within claim 19 and the use of "shutter" in the file history, JCM concludes that "a shutter member" refers to a part of  "a shutter" or "a shutter assembly."  Specifically, JCM defines "shutter member" as "a rotating cylindrical shaped structure component of the shutter having an outer surface that will obstruct or block an aperture and a slot through which a document may pass," meaning that the shutter member is the length portion of the shutter or shutter assembly that extends across the document channel.  JCM defines "shutter" as "a blocking device positioned between the aperture and the inlet channel of a document processor—and actuating components that move the blocking device."  Thus, the terms "shutter" and "shutter assembly," by JCM's construction, both account for the "actuating components" in addition to the shutter member.

Mars argues that the '589 Patent uses the terms "shutter" and "shutter member" interchangeably and that both should be construed to mean "[a] structure capable of obstructing a document transport passage in a document handling apparatus."  Mars makes three arguments in support of this construction.  Primarily, Mars rests on the plain language of claim 19 in the context of the specification.  Mars points out that claim 19 states that the "shutter member" includes a "passage through which a document can pass," and further that, although "shutter member" is not used in the specification, the only structure that contains a passage or slot through which a document can pass is the structure labeled "shutter."  Therefore, Mars concludes, "shutter member" must be another term for "shutter."  In addition, Mars refers to the prosecution history, which demonstrates that the same reference number was used to designate

10

both "shutter member" and "shutter" in the European precursor to the '589 Patent.  Lastly, Mars attacks JCM's proposed construction as adding limitations that are not present in claim 19.  Mars disagrees that "shutter member" should be termed "a blocking device" because the '589 Patent never uses that phrase.  Mars also disputes that the shutter must be positioned between the aperture and the inlet channel.  Moreover, Mars contends that the shutter need not be cylindrical in shape; therefore, JCM's characterization of the shutter in claim 19 is inaccurate.

"Shutter" and "shutter member" as those terms are used in the '589 Patent would have been understood as synonymous by one ordinarily skilled in the field of document handlers.  The use of different terms in close proximity to one another within the same claim gives rise to the inference that a different meaning should be assigned to each.  Bancorp Servs., L.L.C. v. Hartford Life Ins. Co., 359 F.3d 1367, 1373 (Fed. Cir. 2004) (citation omitted).  "That inference, however, is not conclusive; it is not unknown for different words to be used to express similar concepts, even though it may be poor drafting practice."  Id.  Although claim 19 employs two different terms, the wording of the claim leads this Court to conclude that they would have been understood to refer to the same structure.  "[S]aid shutter" follows "shutter member," and there is no intervening term that would suggest "said shutter" refers to anything other than the aforementioned shutter member.  Cf. Manual of Patent Examining Procedure § 2173.05(e) ("lack of clarity [can] arise where a claim refers to 'said lever' . . . where the claim contains no earlier recitation or limitation of a lever and where it would be unclear as to what element the limitation was making reference.").  The Court attributes to poor drafting the use of both "shutter" and "shutter member" to indicate the same structure.  Nonetheless, the drafting is not so unclear that a person of ordinary skill in the art would not understand the two terms to share the same

11

meaning.

Furthermore, claim 19 states that the "shutter member" includes a "passage through which a document can pass." As Mars points out, the only structure depicted in the drawings that contains a passage through which a document can pass is the structure labeled "shutter." Thus, there is no alternative structure JCM can point to that as a "shutter member" distinct from the shutter.

Moreover, the Court finds several reasons to reject JCM's proposal to define "shutter" and "shutter member" as including a "rotating cylindrical shaped structure." First, nothing in the language of claim 19 suggests that the shutter must be a cylinder. Indeed, claim 20 describes a "rotationally symmetrical" shutter; thereby suggesting that claim 19 does not share that limitation. See Phillips, 415 F.3d at 1314-15 ("the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation is not present in the independent claim."). In addition, the specification describes the invention in one embodiment as having a shutter approximately in the shape of a cylinder. (JCM's Claim Const. Br. Ex. 1 col. 3:13-14 (emphasis added).) Thereafter, the summary refers to "the cylindrical shape" and "the cylinder"; however, these terms are presumably understood to refer back to the form "approximately in the shape of a cylinder" previously described. Finally, the description of figure 20, which shows a noncylindrical, rotationally asymmetrical shutter, states "[t]his exemplary embodiment shows that there is no limitation with regard to the external shapes of the shutter, which can meet other requirements without departing from the scope of the invention." (Id. Ex. 1 col. 14:51-54; see also id. Ex. 1 col. 14:46-47 ("Fig. 20 shows an exemplary embodiment of the invention in which the shutter has an asymmetrical shape in relation to its

12

axis of rotation.").)  Accordingly, it would be inappropriate to define "shutter" and "shutter member" as cylindrical.

Furthermore, the shutter does not have to be located between the aperture and the inlet channel.  In fact, Figures 1, 3, 16 show the placement of the shutter downstream of both the aperture and the inlet channel.  The critical element conveyed by claim 19 is that the shutter prevents a prematurely entered second document from reaching the document validating mechanism, thereby interfering with its processing.  To fulfill this function, the shutter must be placed at some point between the inlet aperture and the validating mechanism.  In sum, the Court will construe "the shutter," "said shutter," and "shutter member" to mean: a structure capable of blocking a document, positioned between the inlet aperture and the document validating mechanism.

### 3.    "a passage through which a document can pass"

JCM proposes to define this phrase as "a slot extending into or through the cylindrical shutter member."  Mars, on the other hand, argues that the phrase needs no further explanation and that its construction requires no alteration of the phrase itself.  Mars argues further that no reference to the shutter member is necessary in the definition of this phrase because its relationship to the shutter member is evident from its context: "a shutter arrangement comprising a shutter member including a passage through which a document can pass"  (emphasis added).

The Court agrees with Mars and finds that the meaning of the phrase "a passage through which a document can pass" would have been readily understandable to a layperson as well as a person of ordinary skill in the art.  The Court will not attempt to explicate the meaning of an already clear phrase and thereby risk altering the scope of the claim.  See Scripps Clinic v. Res.

Found. v. Genentech, Inc., 927 F.2d 1565, 1580 (Fed. Cir. 1991) ("the construction of claims is simply a way of elaborating the normally terse claim language: in order to understand and explain, but not to change, the scope of the claims.").  Moreover, it would be redundant to define "a passage through which a document can pass" with reference to the shutter when the claim itself already states the relationship between those two aspects.

4.      "said passage being alignable"

JCM requests that this phrase be defined as "the slot into or through the cylindrical shaped shutter member of the shutter can move to align the slot with the inlet aperture and a passageway through the validator."  Mars again contends that this definition imports additional limitations and conflicts with the plain language of claim 19, which states that the passage is alignable with "a document transport passage," not necessarily the inlet aperture.

The Court will construct "said passage being alignable with" to mean "said passage being alignable with" for the same reasons that apply to the previous limitation.  The import of this phrase would have been apparent from its plain language; therefore, there is no reason to attempt to explain it with further definition.

5.      "a document transport passage of a document handling apparatus"

The definition offered by JCM for this phrase is "a pathway within a device for handling documents configured to transport or move a document through the device."  Mars again argues for a plain meaning definition.  While the meaning of the phrase "a document transport passage of a document handling apparatus" might not have been as readily apparent to a layperson as the previous two limitations would have been, the standard the Court must apply is what meaning a person of ordinary skill in the art would have applied to the phrase at the time of the invention.

Based on the description of the prior art contained in the '589 Patent, the Court concludes that a such a person would have found this disputed phrase to mean precisely what it states. The relevant field in this inquiry is that of document handlers, so a person of ordinary skill in that field would be familiar with the meaning of "document handling apparatus." In addition, document transport passages are integral components of such machines and would be readily understood by one of ordinary skill in the field. (See JCM's Claim Const. Br. Ex. 1 col. 1:22-29 (discussing passages, inlet channels, and "what is commonly termed a transport system" in description of background art).) As a result, there is no need to augment the language of this limitation, since its meaning is already plain.

### 6. "pivoting the shutter assembly about the pivot axis"

The '589 Patent does not define "pivot"; however, that term is used in both the specification and in claim 19. JCM concludes based on the usage of "pivot" and how that usage relates to the meaning of "rotate," that "pivoting the shutter assembly about the pivot axis" means "the shutter has some assembly element (other than the shutter member) that swings around an axis that may be the axis of rotation of the shutter member." In other words, due to the use of "pivot" in the specification, "pivoting about the pivot axis" in claim 19 cannot refer to the rotation of the shutter around its rotational axis, and instead must reflect the pivoting of some unnamed component of the shutter's actuating parts. In support of this construction, JCM draws particularly on figures 11-14, which depict an actuating arm that pivots about an axle different from the axis around which the shutter rotates. (Id. Ex. 1 figs. 11-14, col. 11:7-13:16.)

Mars disagrees, arguing that "pivot" and "rotate" as those terms are used in the '589 Patent mean essentially the same thing. In support of its argument, Mars refers to language in

both the specification, which states "the present invention provides a pivotable shutter which is rotationally symmetrical about a pivoting axis" (Id. Ex. 1 col. 2:62-3:2), and to dependant claim 20, which states "[the cylindrical shutter] is movable in rotation about an axis."

While JCM is correct that in the embodiment depicted in figures 11-14, an assembly element of the shutter swings around an axis; that axis not also the axis of rotation of the shutter. In fact, no embodiment describes such a configuration. Significantly, the purpose of the shutter as understood from the intrinsic evidence, is to enable the introduction of a document and then move in such a way as to block the premature introduction of a second document. Claim 19 outlines this basic function. "Pivoting the shutter assembly about the pivot axis" is the sole phrase in claim 19 that addresses the movement of the shutter. As a result, the Court will reject JCM's construction, as the Court finds it unlikely that a person of ordinary skill in the art would have thought that claim 19 refers to the movement of an unnamed component, which may or may not have the same rotational axis as the shutter.

In discerning the meaning of "pivot," the Court must look first to the language of claim 19 and the two claims that depend from it, since the intrinsic record does not define either "pivot" or "rotate." Claim 19 uses "pivot" and "pivoting" exclusively and does not reference "rotation." Dependent claim 20, however, states "the shutter comprises a rotationally symmetrical shutter." Viewing these limitations together suggests that pivoting the shutter must also encompass rotating it. Thus, the specification apparently uses these terms interchangeably.

In addition, the use of "shutter assembly" in the context of "pivoting the shutter assembly about the pivot axis" must be determined. Both JCM and Mars argue that "shutter" and "shutter assembly" share the same meaning, although their understanding of that shared meaning differs.

16

As previously mentioned, "shutter assembly" is neither defined in the '589 Patent nor used anywhere apart from claim 19. The specification does refer to "assembly," however, stating: "[t]he mass of the assembly comprising the shutter and its actuating components (and other components which can move with the shutter) is distributed such that there is no turning movement or couple about the axis around which the shutter pivots." (Id. col. 2:39-43.) This usage suggests that "shutter assembly" means what has already been defined as the shutter/shutter member plus its actuating components. As a result, the Court will define "pivoting the shutter assembly about the pivot axis" as "pivoting or rotating the shutter and its actuating components about the pivot axis."

### 7.    surround

The '589 Patent does not explicitly define "surround" either. The term is used several times in claim 19 ("said shutter being located within a surround, wherein the surround and the shutter carry mutually interengaging features to prevent a flat document from passing between the shutter and the surround") and once in dependent claim 20 ("A shutter arrangement according to claim 19 in which said features comprise castellation upon at least either said shutter or said surround."). The term is mentioned twice in the specification and is shown in one of the drawings.

JCM contends that the intrinsic evidence is not helpful in arriving at a definition and so employs a dictionary, which defines "surround" in this context as "something that surrounds something (as a border or edging) surrounding or nearly surrounding a central object or area." (Id. at 27 (quoting Webster's Third New International Dictionary (1986)).) As additional extrinsic evidence, JCM offers the declaration of Robert L. Gorgone as representative of one

17

ordinarily skilled in the field.  Mr. Gorgone states that "surround" would have been understood to mean that the rotating drum is enclosed in a shell having an internal cavity shaped to match the cylindrical shutter.  Lastly, JCM argues that the '589 Patent fails to provide any guidance regarding what its particular "surround" looks like in its entirety.  JCM surmises therefore that the prior art provides the only clue as to the appearance of the surround, and the prior art depicts surrounds as cylindrical shells.  Based on these sources, JCM offers this definition: "a shell casing or recess structure defining a cavity enclosing the cylindrical shutter member."

Mars disputes this definition, objecting particularly to its characterization of the shutter as "enclosing the cylindrical shutter member."  Mars reiterates that the shutter need not be cylindrical and additionally argues that the surround need only cover a portion of the shutter, rather than "enclosing" it.  Mars also disclaims JCM's reference to extrinsic evidence, maintaining that the meaning of surround is knowable based solely on the intrinsic record.  Mars would have this Court define "surround" as "a portion of the inner-housing in the document handling apparatus in which the shutter rotates."

A person of ordinary skill in the art would have understood "surround" to mean "a casing or seating structure in which the shutter rotates."  In its summary of the invention, the '589 Patent states "[a] drawback of shutters offering a smooth surface to the leading edge of the document introduced into the aperture is that the document may stray into the space comprised between the shutter and its casing or its seating."  (Id. Ex. 1 col. 3:30-33.)  And later in that same paragraph, referring to how the '589 Patent reflects a solution to that problem, the summary states "[t]hese teeth prevent the document from straying between the shutter and its surround."  (Id. col. 3:42-44.)  Consequently, it is reasonable to assume that the "surround" is the same kind

18

of casing or seating known in the prior art.  Also, the description in claim 19 of the shutter being located "within" the surround belies Mars' argument that the surround is only "a portion of the inner-housing."  JCM correctly points out that the '589 Patent does not depict the surround in its entirety in any of the drawings; however, that deficiency does not impede the construction process, because the patent does convey the vital information about the surround: that it is the structure in which the shutter rotates or pivots.

> 8.   **"wherein the surround and the shutter carry mutually interengaging features to prevent a flat document from passing between the shutter and the surround"**

The use of interengaging features to keep a document on its proper path is purported to be a novel aspect of the '589 Patent.  (Id. Ex. 1 col. 3:31-45.)  JCM submits that if the shutter is indeed cylindrical in shape, then the interlocking features of the shutter must be present around the entire outer surface of the shutter, such that they engage with the surround both when the slot is aligned with the document transport path and when it is out of alignment.  As such, JCM offers the following definition for this limitation:

> a shutter member is a cylindrical rotating assembly having surface features such as ribs and grooves that interengage with corresponding opposite surface features of a shell casing or recess structure defining a cavity enclosing the cylindrical shutter member, the ribs and grooves features cooperating to prevent a flat document from passing between the shutter member and the shell, casing or recess structure when the shutter member is in any non-aligned rotational position.

Mars on the other hand, proposes: "the surround and the shutter carry mutually interengaging features to prevent a flat document from passing between the shutter and the surround when the passage through the shutter is aligned with the document transport passage."  Mars cites the description of figure 14, which characterizes the mutually interengaging features as "prevent[ing] banknotes from being slid around the shutter

19

rather than through the slot," as evidence that the features engage only when the slot is aligned with the document transport channel.  (See id. Ex. 1 col. 13:8-16.)

The '589 Patent explains this feature in the summary of the invention as follows: "the present invention provides a pivotable shutter which is rotationally symmetrical about a pivoting axis, which carries projecting and/or recessed portions to engage with corresponding recessed and/or projecting portions in the surround to the shutter, to prevent a document from passing between the surround and the shutter."  (Id. Ex. 1 col. 2:62-3:1.)  The intrinsic evidence is silent as to whether the interengaging features are present around the entire outer surface of the shutter and/or surround.  Rather, claim 19 describes interengaging features that are intended to "prevent a document from passing between the surround and the shutter," which "advantageously prevents jams in the region of the shutter and attempts to defraud the apparatus."  (Id. Ex. 1 col. 2:64-3:2.) The language on which Mars relies indicates that those features do indeed engage when the slot and transport channel are aligned; however, it does not preclude engagement in other positions as well.  Accordingly, Mars' proposed construction would import a limitation not present in claim, namely that the mutually interengaging features prevent a flat document from passing between the shutter and the surround only "when the passage through the shutter is aligned with the document transport passage."  Nothing in the language of '589 Patent suggests that the mutually interengaging features only operate when the slot is aligned with the document transport path.  Therefore, the Court will not elaborate on this limitation of claim 19 and will define it simply as "wherein the surround and the shutter carry mutually interengaging features to prevent a flat document from

passing between the shutter and the surround."

### 8. "document"

Claim 19 recites "document" four times.  It is used in the phrase "a document can

pass," then twice in the phrase "a document transport passage of a document handling

apparatus," and finally in "prevent a flat document from passing."  Unlike the other terms

in question, the '589 Patent actually provides a definition of "document" in the

specification: "Throughout the following, the term document will designate a rectangular

sheet of paper or other material of suitable dimensions, introduced by the user into the

selector, this sheet being recognized as a genuine note or not after authentication tests."

(Id. Ex. 1 col. 1:14-18.)

Based on the '589 Patent's alleged incorporation by reference of a foreign patent

and its antecedent application, JCM argues that the term "banknote" means "any

document of value, such as a cheque, bond, credit card or bank card."  Incorporating this

definition, JCM would have this Court construct "document" to mean "a rectangular

sheet of paper or other material of suitable dimensions recognized as a genuine note or

banknote, including any document of value, such as a cheque, bond, credit card or bank

card."  Mars accuses JCM of attempting to import limitations found nowhere in the '589

Patent.  Mars argues that an abbreviated form of the definition found in the patent itself

should be employed: "a rectangular sheet of paper or other material of suitable

dimensions."  The Court will adopt the meaning specifically ascribed to "document" in

the '589 Patent.  See CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1366 (Fed.

Cir. 2002) (stating that where patentee clearly sets forth definition of disputed claim term

in patent's specification, courts adopt that meaning).  Thus, the meaning is, "a rectangular sheet of paper or other material of suitable dimensions."

### B.    Claim 20

Claim 20 states: "A shutter arrangement according to claim 19 in which the shutter comprises a rotationally symmetrical shutter."  JCM argues that this means "a shutter arrangement having all the limitations of claim 19, and in which the shutter and member is 'rotationally symmetrical' in that it has a cross section through the axis of rotation about which the slot and the opposing components forming the cylinder are the same."  In arriving at this definition, JCM draws from the summary of the invention, which equates "rotationally symmetrical" with "homogeneous mass mounted concentrically."  (JCM's Claim Const. Br. Ex. 1 col. 2:52-53.)  In response, Mars contends that a rotationally symmetrical shutter need not have a rotationally symmetrical slot, as JCM's definition requires, and Mars again disputes JCM's characterization of the shutter as cylindrical.  Mars suggests as a fitting definition, "the shutter member of claim 19 is rotationally symmetrical about a pivoting axis."

Mars' definition is insufficient, however.  Unlike some of the limitations of claim 19, the meaning of  "rotationally symmetrical" is not self-evident and necessitates further definition.  Based on the arguments of the parties, the Court concludes that a person of ordinary skill in the art would have thought this term to mean that were the shutter cut in half, each half would be identical.  To be rotationally symmetrical, not only the external boundary of the shutter but the slot, too, must be rotationally symmetrical, because according to claim 19, the slot is a part of the shutter.  As a result, the Court will draw

from JCM's proposed definition and define claim 20 to mean "a shutter arrangement having all the limitations of claim 19, and in which the shutter has a cross section through the axis of rotation about which the opposing components forming the cylinder are the same."

### C.     Claim 21

Claim 21 provides: "A shutter arrangement according to claim 19 in which said features comprise castellation upon at least either said shutter or said surround."  On this limitation, JCM and Mars disagree on the way to describe "castellations."  JCM proposes "a shutter arrangement having all the limitations of claim 19, and in which the 'mutually interengaging features' of the shutter member and the surround are in the shape of square cut grooves—castellations—that match oppositely with square cut ridges on the outer surface of the cylindrical shutter member."  Mars argues that this definition improperly imports the words "grooves," "match," and "ridges" from the extrinsic evidence, and Mars instead suggests the claim be construed to mean "the mutually interengaging features of claim 19 comprise square cut recesses and teeth like the top of a castle upon at least either said shutter or said surround."

The only guidance available from the intrinsic record is the statement in the specification concerning the embodiment of figure 14 of the invention: "interengagement of the recesses 17 and teeth 60 with corresponding castellations in the surround portion 70 between the mouthpieces 16 and the shutter 5."  (Id. Ex. 1 col. 13:11-13.)  Both parties agree that the castellations should be described as "square cut"; however, Mars' definition draws on the vocabulary of the specification rather than extrinsic evidence.

23

The Federal Circuit has instructed that the specification is the single best guide to the meaning of a disputed term.  See Phillips, 415 F.3d at 1315.  Therefore, the Court will utilize Mars' proposed definition of claim 21: "the mutually interengaging features of claim 19 comprise square cut recesses and teeth like the top of a castle upon at least either said shutter or said surround."

### D.    Unasserted Claims 1, 5, 6, 8, and 9

Mars has not alleged infringement of independent claim 1 nor of dependent claims 5, 6, 8, and 9.  Nevertheless, JCM asks this Court to construct these claims because it alleges they are relevant to whether Mars failed to disclose on sale or best mode information, a defense it purports to have pled in its Answer.  Mars maintains that only claims at issue need to be constructed and that JCM has not adequately explained why these claims should be defined.

The Court declines to construct claims that are not at issue.  Trial courts have broad powers of case management, including over the process of claim construction.  See Jack Guttman. Inc. v. Kopykake Enters., Inc., 302 F.3d 1352, 1361 (Fed. Cir. 2002). Because JCM has not demonstrated why construction of the unasserted claims is necessary at this time, the Court will not construe the meanings of the undisputed claims.

## V.    INVALIDITY

JCM submits that claims 19-21 of the '589 Patent are invalid as being anticipated by a prior art reference.  The allegedly anticipating reference is an Australian patent application for a card reader invented by Franz Rossler.  JCM has employed similar tactics in defending against Mars' infringement suit in Germany, arguing that a German

patent application for the same Rossler card reader is invalidating prior art.  Although the German and Australian applications are largely identical, JCM bases its argument here on the Australian application because it is in English.

###### A.      Estoppel

JCM argues that Mars' conduct in the nullity suit before the German Patent Office estops it from advancing contrary positions before this Court.  After JCM confronted Mars with the German Rossler Reference, Mars added new limitations to the corollary to claim 19 in its German patent.  Mars also made two statements in a brief in the German action, first that the German Rossler Reference teaches "mutually interacting features at a rotating shutter and its casing" and also allegedly characterizing the German Rossler Reference as preventing "a plastic-like object from being introduced between the shutter and its casing."

Mars argues that none of its actions in the German action qualify as admissions that the claims corresponding to the '589 Patent's claims 19-21 are anticipated by Rossler.  Mars argues further that under the Paris Convention, the '589 Patent and its German counterpart are "completely separate patents governed by two completely different bodies of patent law."  Lastly, Mars contends that the doctrine of foreign prosecution history estoppel does not apply to this situation.

Judicial estoppel is intended to prevent a litigant from asserting a position inconsistent with one that it has previously asserted in the same or previous proceeding.  In re Chambers Dev. Co., Inc., 148 F.3d 214, 229 (3d Cir. 1998).  "It is not intended to eliminate all inconsistencies, however slight or inadvertent; rather, it is designed to

prevent litigants from playing fast and loose with the courts."  Id.  A court has discretion

to impose judicial estoppel only if: "(1) the party to be estopped is asserting a position

that is irreconcilably inconsistent with one he or she asserted in a prior proceeding; (2)

the party changed his or her position in bad faith, i.e., in a culpable manner threatening to

the court's authority or integrity; and (3) the use of judicial estoppel is tailored to address

the affront to the court's authority or integrity."  Montrose Med. Group Participating

Savs. Plan v. Bulger, 243 F.3d 773, 777-78 (3d Cir. 2001).

        JCM fails to make a case for judicial estoppel against Mars based on its conduct

before the German Patent Office.  The German action is in a foreign jurisdiction, which

likely has different burdens of proof and issues of law and fact; therefore, it is not clear

that Mars' position is irreconcilably inconsistent with its position here.  In addition, JCM

has not shown the requisite bad faith or affront to judicial integrity; the mere fact that

Mars elected a different litigation tactic in that action than in this one does amount to an

admission of the invalidity claim 19.  See Astra Aktiebolag v. Andrx Pharm., Inc., 222 F.

Supp. 2d 423, 577 (S.D.N.Y. 2002) (citing Quad Envtl. Techs. v. Union Sanitary Dist.,

946 F.2d 870, 873-74 (Fed. Cir. 1991)) (refusing to estop patentee's argument that certain

references were not prior art based on patentee's failure to dispute that point before

European Patent Office).  As a result, the Court will not impose judicial estoppel.

        **B.      § 102 Prior Art**

        JCM submits that claims 19-21 of the '589 Patent are invalid as being anticipated

by Rossler.  35 U.S.C. § 102(b) provides that a patent can be rendered invalid if "the

invention was . . . described in a printed publication in this or a foreign country or in

26

public use or on sale in this country, more than one year prior to the date of the application for patent in the United States."  "The 'printed publication' provision of § 102(b) 'was designed to prevent withdrawal by an inventor . . . of that which was already in the possession of the public.'"  Bruckelmyer v. Ground Heaters, Inc., 445 F.3d 1374, 1378 (Fed. Cir. 2006) (quoting In re Wyer, 655 F.2d 221, 226 (CCPA 1981)).  A given reference is a "printed publication" if it was "publicly accessible" during the prior period.  Id.  A party can establish that a given reference is "publicly accessible," by demonstrating that such document "has been . . . made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence, can locate it."  Id. (internal quotation marks and citation omitted).

The prior art period for the '589 Patent ends on September 30, 1993, one year prior to the date Mars filed the U.S. patent application.  (See JCM's Ex. 1.)  Mars does not dispute that Rossler, dated January 10, 1991, was publicly accessible during the prior art period.  Thus, Rossler is § 102 prior art.

### C.     Anticipation

JCM argues that Rossler discloses each and every claim limitation in claims 19-21 and therefore invalidates them.  Mars counters that Rossler is not a document handler but a card reader, which Mars argues is inherently different.  In addition, Mars states that Rossler does not address the same problem as claims 19-21.  Finally, Mars maintains that Rossler does not disclose "a document" or "wherein the surround and the shutter carry mutually engaging features to prevent a flat document from passing between the shutter and the surround."

Patent validity is a question of law.  See Graham v. John Deere Co. of Kansas City, 383 U.S. 1, 17 (1966).  "A patent is presumed valid."  Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc., 853 F.2d 1557, 1562 (Fed. Cir. 1988).  Moreover, "[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; [and] dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim."  See id.; Dayco Prods., Inc. v. Total Containment, Inc., 329 F.3d 1358, 1370 (Fed. Cir. 2003).  Due to the presumption of validity, a party challenging a patent's validity "must establish facts, by clear and convincing evidence, which persuasively lead to the conclusion of invalidity."  See Avia, 853 F.2d at 1562.

Whether a piece of prior art is anticipating is a question of fact.  Apple Computer, Inc. v. Articulate Sys., 234 F.3d 14, 20 (Fed. Cir. 2000) (citing Scripps Clinic & Research Found. v. Genentech, Inc., 927 F.2d 1565, 1576 (Fed. Cir.1991)).  An "anticipating" reference must describe all of the elements and limitations of the claim in a single reference, and enable one of ordinary skill in the field of the invention to make and use the claimed invention; hence, an anticipating reference is termed "enabling."  Merck & Co., Inc. v. Teva Pharm. USA, Inc., 347 F.3d 1367, 1372 (Fed. Cir. 2003).  Stated otherwise, to find that prior art anticipates, this Court must conclude that, as viewed by a person of ordinary skill in the field, there is no difference between the claimed invention and the prior art reference.  Scripps Clinic & Research Found., 927 F.2d at 1576 (citations omitted).  On summary judgment, once an alleged infringer presents facts sufficient to establish a prima facie case of invalidity, the patent holder must come

28

forward with some evidence raising a genuine issue of material fact to the contrary.

Sinskey v. Pharmacia Opthalmics, Inc., 982 F.2d 494, 498 (Fed. Cir. 1992).

### i.    Rossler

Claim 1 of the Rossler reference teaches "a card reader having an input/output slot which is blockable by a blocking device when a card has been inserted."  Claim 2 states "a card reader as claimed in claim 1, wherein the blocking device is a rotatable cylinder supported in two bearing shells and having an opening therethrough."  Claim 3 continues, "a card reader as claimed in claim 2, wherein the surface of the cylinder and the surfaces of the bearing shells have grooves and ridges over the entire card width which correspond to one another."

### ii.    Claim 19

This Court has construed claim 19 to mean:

> A structure capable of blocking a document, which is positioned between the inlet aperture and the document validating mechanism, including a passage through which a document can pass, said passage being alignable with a document transport passage by pivoting or rotating the shutter and its actuating components about the pivot axis, said shutter being located within a casing or seating structure in which the shutter rotates, wherein the surround and the shutter carry mutually interengaging features to prevent a flat rectangular sheet of paper or other material of suitable dimensions from passing between the shutter and the surround.

Like claim 19, Rossler discloses a structure that is capable of blocking, "a blocking device."  Similarly, Rossler teaches the position of this structure between the point where the card is inserted into the machine and the validating equipment.  (See JCM's Invalidity Br. Ex. 2 fig. 1.)  Rossler also includes a passage through which a document can pass, and that passage is alignable with the document transport passage by rotating.  (See id. Ex. 2 col. 9 (teaching opening through a rotatable cylinder).)  Furthermore, Rossler discloses the blocking device in the

form of a rotating cylinder with actuating components that pivot about an axis.  (See id. Ex. 2 col. 5:1-2.)  The cylinder in Rossler is "supported in two bearing shells," which as depicted in figure 3, demonstrate the same relationship the shutter has to the surround in claim 19.  Finally, Rossler discloses the surface of the cylinder and the surfaces of the bearing shells having "grooves and ridges over the entire card width which correspond to one another," which in the Rossler drawings resemble the mutually interengaging features of the claim 19. Nevertheless, Mars has adduced sufficient evidence to raise genuine issues of material fact concerning whether Rossler anticipates claim 19 in its entirety.

### a.    Shutter

Nowhere does Rossler use the term "shutter."  Instead it refers to a blocking device, which in some embodiments is a rotatable cylinder.  The '589 Patent states expressly that the shutter is not limited to a cylinder.  Indeed, the '589 Patent suggests the shutter does not even need to be symmetrical in shape.  In addition, one of the inventive aspects cited in the '589 Patent's specification is that the invention solves the problem encountered in the prior art of sensitivity to vibration.  This improvement is due in part to the distribution of the mass of the shutter and its actuating components.  (See JCM's Invalidity Br. Ex. 1 col. 2:19-56.)  This explanation suggests that experimentation was necessary to get from Rossler to the invention claimed by claim 19, and thus questions of fact remain as to whether the Rossler reference is enabling of the shutter feature.

### b.    Mutually Interengaging Features

JCM points out that in addition to the language of claim 3 ("a card reader as claimed in claim 2, wherein the surface of the cylinder and the surfaces of the bearing shells have grooves

30

and ridges over the entire card width which correspond to one another"), Rossler further explains its design:

> as shown in [Figure 3], it is possible to provide the surfaces of the cylinder 6 and the bearing recesses 8 and 9 with matching ridges 46 and grooves 45. It is advantageous to provide these in the form of a screw thread. They should preferably extend over the whole width of the insertion/retrieval slot, or the whole width of the card. This ensures that, in the locked position of the cylinder 6, no foil like object can be introduced between the cylinder surface and the bearing recess surfaces.

(Id. Ex. 2 col. 5:20-27.) Based on this passage and on Rossler's figure 3, which appears to show square-shaped ridges, JCM contends that Rosser anticipates the mutually interengaging features claimed in the '589 Patent.

Mars casts doubt on this assertion, however, with the testimony of JCM's own expert, Mr. Gorgone. Mr. Gorgone stated that none of the figures in Rossler are clear to him, that he could not understand how the ridges and grooves of Rossler match, and most importantly, that figure 3 of Rossler does not disclose the same design as the '589 Patent. (Mars' Invalidity Opp'n Ex. 7 at 116-17, 163-64.)

Furthermore, Mars has put forth evidence that draws into question whether Rossler discloses mutually interengaging features to prevent a flat rectangular sheet of paper or other material of suitable dimensions from passing between the shutter and the surround. Rossler describes that when its slot is out of alignment with the transport passage, "no foil like object can be introduced between the cylinder surface and the bearing recess surfaces," referring to a technique used for defrauding card reading machines. As highlighted by the testimony of Mr. Gorgone, the problem addressed by claim 19 of the '589 Patent is a different one, namely keeping documents on their intended path. (Id. at Ex. 7 140-41.) Consequently, Mars has shown

31

genuine issues of material fact with respect to whether Rossler is enabling of the mutually interengaging features of claim 19.

### iii.   Claim 20

This Court has construed claim 19 to mean "a shutter arrangement having all the limitations of claim 19, and in which the shutter has a cross section through the axis of rotation about which the opposing components forming the cylinder are the same."  JCM argues that the cylindrical blocking device in Rossler is by definition rotationally symmetrical and thus reads on claim 20.  While this may be true, because questions of fact exist as to whether Rossler anticipates claim 19 and because claim 20 depends from claim 19, thus incorporating all its limitations, too, the Court cannot conclude as a matter of law that Rossler enables claim 20.  See Markman v. Westview Instruments, Inc., 52 F.3d 967, 1000 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996) (stating that a dependent claim includes all of the limitations of the independent claim).

### iv.   Claim 21

The Court has construed claim 21 to mean "the mutually interengaging features of claim 19 comprise square cut recesses and teeth like the top of a castle upon at least either said shutter or said surround."  JCM points to the similarity between the ridges and grooves depicted in Rossler's figure 3, which do look "square cut," and figure 14 in the '589 Patent.  Rossler does not use the word "castellation," "square cut," or anything approximating those terms, but rather refers to the grooves and ridges as being in the form of a "screw thread."  Mars has offered the testimony of Mr. Gorgone to suggest that a person ordinarily skilled in the art would have viewed these concepts as different.  (Id. Ex. 7 at 144:6-18.)  Therefore, Mars has shown a disputed issue of fact specific to Rossler's anticipation of claim 21, in addition to those already enumerated

relating to claim 19 from which claim 21 depends.

## VI.   UNENFORCEABILITY

JCM argues that this Court should exercise its discretion to judge the '589 Patent

unenforceable due to allegedly inequitable conduct on behalf of the inventor, Mr. Tinoco and

others associated with the prosecution of the '589 Patent.  Each person associated with the filing

and prosecution of a patent application are held to the highest standards of honesty and candor.

See 27 C.F.R. § 1.56(a).  Breach of the duty of candor and good faith during the patent

application process can render a patent unenforceable.  Life Techs., Inc. v. Clontech Labs., Inc.,

224 F.3d 1320, 1324 (Fed. Cir. 2000).  To prove inequitable conduct, a party must show by clear

and convincing evidence first, that the patent application omitted material information or

misrepresented material facts, and second, that the applicant did so with the intention of

misleading or deceiving the patent examiner.  See Monsanto Co. v. Bayer Bioscience N.V., 363

F.3d 1235, 1239 (Fed. Cir. 2004).  Information is considered material if there is a substantial

likelihood that a reasonable examiner would consider it important in deciding whether to allow

the patent.  See Digital Control Inc. v. Charles Mach. Works, 437 F.3d 1309, 1314-16 (Fed. Cir.

2006).  The Federal Circuit has explained that the issue of "materiality" does not center on

whether the withheld information would have rendered the claims invalid; rather, materiality

relates to whether a reasonable examiner would have considered the information.  Id. at 1314.

Regarding the second prong, the court must have a factual basis for a finding of deceptive intent.

See In re Hayes Microcomputer Prods., Inc. Patent Litig., 982 F.2d 1527, 1546 (Fed. Cir. 1992).

Such intent, however, need not be proven by direct evidence.  See Frazier v. Roessel Cine Photo

Tech. Inc., 417 F.3d 1230, 1235 (Fed. Cir. 2005).  If the moving party satisfies these threshold

showings, the court must then balance the equities to determine whether the applicant has committed inequitable conduct.  See Monsanto, 363 F.3d at 1239.

In support of its unenforceability argument, JCM cites the deposition testimony of Mr. Tinoco, the inventor.  Mr. Tinoco testified that he did not read in its entirety the application that resulted in the '589 Patent prior to signing it, that he did not recall reading the oath in the application, that the duty of disclosure was not clear to him at the time he signed the application, and that he did not draw certain figures contained in the '589 Patent.  (JCM's Invalidity Ex. 10 at 122-23, 125-27.)  In addition, JCM alleges that in 1993 and 1994, Mars promoted a product that incorporated the features disclosed in the '589 Patent.  JCM argues that Mr. Tinoco and his attorneys had an obligation to provide documentation related to the design and promotion of that product to the patent examiner in connection with the application.  The failure by Mr. Tinoco and his attorneys to do so, JCM contends, violated the duty of disclosure.  Mars disputes JCM's allegations and argues that even if the Court were to accept them, JCM has failed to establish that there was a material omission or misstatement made to the patent examiner, and further, that JCM has failed to even allege an intent to deceive the patent office by the inventor or his attorneys.

A.     False Oath

The oath to which Mr. Tinoco attested consists of a series of acknowledgments and claims, including the belief that the inventor is the original, first, and sole inventor of the subject matter; a statement that the inventor has reviewed and understood the contents of the specification and claims; and an acknowledgment of the duty to disclose information material to patentability.  Therefore, Mr. Tinoco's testimony that some of the designs in the '589 Patent are

34

not of his creation and that he did not review the application for the '589 Patent prior to signing it constitute misrepresentations.  Moreover, the Court finds they are misrepresentations satisfying the threshold of materiality, since they are matters "within a reasonable examiner's realm of consideration."  See 35 U.S.C. § 102(f) ("A person shall be entitled to a patent unless . . . he did not himself invent the subject matter sought to be patented."); Pannu v. Iolab Corp., 155 F.3d 1344, 1349 (Fed. Cir. 1998) (finding that § 120(f) mandates that a patent accurately list the correct inventors of the claimed invention).  The court in Sure Safe Industries, Inc. v. C & R Pier Manufacturing, 832 F. Supp. 293 (S.D. Cal. 1993), held that a false oath in and of itself was not sufficient to invalidate an issued patent.  There, the court reasoned that "no one was injured by [the inventor's] failure to review the application.  There is no element of fraud, except that in signing the oath, [the inventor] promised that he had reviewed the application, when in fact he had not."  Id. at 297.  Mr. Tinoco's failure to review the application is more serious than what occurred in Sure Safe, however, because had Mr. Tinoco read it, he would have realized that some elements were not in fact of his own creation.

Nevertheless, JCM has not adduced sufficient evidence that Mr. Tinoco or his attorneys made these misrepresentations with the intention of misleading or deceiving the patent examiner. In order to so find, the court must have a factual basis, which is lacking here.  The conduct of Mr. Tinoco and his attorneys with respect to the prosecution of the '589 Patent lacked care and thoroughness; however, JCM has not surmounted the necessary threshold finding of intent.

B.      Failure to Disclose

JCM also contends that Mr. Tinoco failed to disclose material prior art to the patent examiner.  In connection with prosecuting a patent, the inventor has a duty to disclose all material prior art.  See 37 C.F.R. § 1.56(a).  To prove that failure to disclose material information constitutes inequitable conduct, a party must show (1) material prior art; (2) knowledge chargeable to an applicant of that prior art and its materiality; and (3) failure of the applicant to disclose the art resulting form an intent to mislead the patent examiner.  Elk Corp. of Dallas v. GAF Building Materials Corp., 168 F.3d 28, 30 (Fed. Cir. 1999).

JCM has not demonstrated by clear and convincing evidence that BNA50 products were described in public documents anywhere or were in public use or on sale in the United States prior to September 30, 1993.  JCM refers to Mr. Tinoco's testimony that the '589 Patent was first incorporated into the BNA50/51 series of products (JCM's Invalidity Br. Ex. 10 at 75) as well as Mars' document dated "28.07.1993" detailing a BNA50 product, which is marked "preliminary information" and "confidential."  This evidence does not establish, however, that the BNA50 product incorporating the '589 Patent was either described in public documents or in public use or on sale in the United States prior to September 30, 1993.  Accordingly, JCM has not met the threshold showing necessary to trigger the Court's judgment on unenforceability for inequitable conduct.

## VII.    CONCLUSION

Based on the foregoing reasoning, the Court will construe claims 19-21 as delineated above.  In light of these constructions, the Court will deny JCM's motion for partial summary judgment on invalidity of claims 19-21 and on unenforceability of the '589 Patent.  An accompanying order shall issue today.

36

Dated:  3-17-08                             s/ Robert B. Kugler
                                           ROBERT B. KUGLER
                                           United States District Judge